UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| RONALD E. MARSHALL,<br>*Prisoner Identification No. 34005-037*<br><br>Plaintiff,<br><br>v.<br><br>WARDEN TIMOTHY S. STEWART<br>RICHARD SHOOK,<br>*Health Service Administrator (Retired)*,<br>J. HAMILTON-RUMER,<br>*Health Service Administrator*,<br>DR. MOHAMMAD MOUBAREK,<br>*Clinical Director*, and<br>TOM GERA, *PA-C*,<br><br>Defendants. | Civil Action No. TDC-16-1645 |

## MEMORANDUM OPINION

Ronald E. Marshall, currently confined at the Federal Correctional Institution in Cumberland, Maryland ("FCI-Cumberland"), filed this civil rights action under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). Marshall alleges that Defendants systematically delayed medical diagnoses and treatment and disregarded the risk to his health, in violation of the Eighth Amendment to the United States Constitution. Pending before the Court is the Motion to Dismiss or, in the Alternative, for Summary Judgment filed by Defendants Warden Timothy S. Stewart ("Warden Stewart"), Health Services Administrator Richard Shook, Health Services Administrator J. Hamilton-Rumer, Dr. Mohammad Moubarek ("Dr. Moubarek"), and Physician's Assistant Tom Gera. For the reasons set forth below, the Motion, construed as a motion for summary judgment, is granted.

# BACKGROUND[1]

Marshall alleges that in December 2012, while confined at the Federal Correctional Institution in Fort Worth, Texas, he was diagnosed as having a mass on the upper portion of his right lung. On January 7, 2013, Marshall arrived at FCI-Cumberland. On January 9, 2013, as part of an initial chronic care visit, his primary care provider noted an abnormal mass on Marshall's lung, which had also been seen on a number of previously taken chest x-rays. FCI-Cumberland medical staff conducted another x-ray and confirmed that the mass was abnormal. Approximately two months later, on March 8, 2013, FCI-Cumberland medical staff performed a CT scan, which confirmed the presence of a right hilar mass on Marshall's lung. Staff determined that a positron emission tomography ("PET") scan was necessary, but the scan was not conducted until April 30, 2013, four days after Marshall had submitted an administrative remedy procedure request ("ARP") complaining of a failure to provide adequate medical care. The scan results were consistent with a cancerous mass, so on May 6, 2013 medical staff requested a consultation and biopsy by a cardiothoracic surgeon. On May 16, 2013, the Warden denied Marshall's April 26, 2013 ARP on the basis that Marshall was receiving frequent and ongoing testing and evaluation. On May 28, 2013, prior to the biopsy, the cardiothoracic surgeon evaluated Marshall and requested a pulmonary function test, which was completed on June 17, 2013. Then on June 27, 2013, Marshall underwent a bronchoscopy, a thorascopy, and a thoracotomy with a wedge biopsy.

Marshall returned to the hospital on July 5, 2013 for a surgical complication—an infection of the pleural fluid, which tested positive for methicillin-resistant Staphylococcus aureus ("MRSA"). In a July 11, 2013 progress report, a physician stated that Marshall had bilateral pneumonia and right

---

[1] All page numbers refer to the page numbers assigned by CM/ECF.

empyema and that "[c]aseating granulomas with organisms consistent with histoplasma" were isolated from his biopsy. Compl. Ex. A at 11, ECF No. 1-1. After several days of treatment, Marshall's condition had improved, but the physician also recommended a follow-up CT scan in four months and various studies.

Following the June 27, 2013 procedures, Marshall was also examined by a local pulmonologist and Dr. Rashida Khakoo, an infectious disease specialist at West Virginia University ("WVU"). The pulmonologist believed that the lung mass was a fungal colonization and recommended no further treatment. Dr. Khakoo examined Marshall on October 28, 2013, requested additional information, and later re-evaluated him with the approval of the FCI-Cumberland Utilization Review Committee. After these consultations, the mass was again determined to be a fungal colonization.

According to Dr. Moubarek, a fungal colonization is not an infection, but a fungus or organism in an area of a person's body. A fungal colonization is not unusual and generally does "not require immediate treatment unless there are other extenuating medical conditions for which the colonization could provide complications." Moubarek Aff. ¶ 10, Mot. Dismiss Ex. 2, ECF No. 14-2. Having considered the input from Dr. Khakoo, FCI-Cumberland medical staff therefore decided to observe, but not actively treat, the mass in Marshall's lung.

The June 27, 2013 procedures had required incisions, and medical staff and Marshall received the following post-procedure instructions: "wash incisions with antibacterial soap and H20," "keep dry," "apply Bacitracin as needed," "keep dressing in place until Friday AM 7/5," "no lifting more than 10 lbs for 4-6 wks," and "report any chest pains, [shortness of breath], fever and chills." Compl. Ex. A at 4 (capitalization altered). Although FCI-Cumberland medical staff

3

followed the recommendations, Marshall had an unhealed wound "approximately one to two millimeters in size" as a result of the surgery. Moubarek Aff. ¶¶ 12-13.

In August 2013, Marshall's incision opened and began to drain, and the oozing continued even after an x-ray and treatment with antibiotics. On October 21, 2013, the area was treated with silver nitrate, which was painful but ineffective. In November, a "long braided stitch was removed from the site," after which the wound closed and no longer drained. Compl. Ex. A at 44.

During the October 21, 2013 visit, Marshall had another CT scan, which revealed scarring along the right chest wall. The thoracic surgeon also evaluated Marshall and ordered a bone scan. The bone scan, which occurred on December 9, 2013, showed changes in his sixth and seventh ribs on the right side which could be indicative of either osteomyelitis or just expected post-operative inflammatory changes and scar tissue. Because Marshall was not diagnosed with a bone infection and the wound had healed, the thoracic surgeon chose to monitor Marshall with no further treatment. The doctor noted, however, that if the wound reopened or started to drain again, Marshall would "most likely need surgical debridement and removal of some rib segments." *Id.* at 44-45.

Medical records reflect that Marshall did not complain of chest pain from December 2013 until March 2014. On March 20, 2014, he appeared at FCI-Cumberland Health Services stating that he had been experiencing sharp pains below his right breast area for the past month, though the pain was not continuous. Gera, who examined Marshall, told him that the pain was the result of the surgery, which would continue for some time, but nevertheless ordered a new x-ray. No further infectious disease follow-up was deemed necessary because the histoplasmosis was inactive. Likewise, during an April 14, 2014 chronic care visit, Gera concluded, after consultation with an infectious disease specialist, and with the x-ray results proving to be negative and other tests

revealing no evidence of histoplasma or yeast, that no follow-up treatment was necessary. Compl. Ex. B at 43, ECF No. 1-2.

The next year, on April 28, 2015, Marshall went Health Services to report pain in his chest and drainage from the surgical site. For an unknown reason, he was turned away, but after filing an informal complaint, Marshall was seen on April 30, 2015. One of his scars had a small opening and, although there was some drainage seen on his shirt, there was no active drainage or redness or sign of infection at the surgical site. The area was cleaned and dressed, and a chest x-ray and follow-up with Marshall's primary care physician was ordered. On May 1, 2015, Marshall saw Gera and again complained of pain in his right chest and drainage from the surgical site. Gera requested a consultation with cardiothoracic surgery and provided Marshall with dressings to keep his wound clean. When Marshall returned to Health Services on May 6, 2015, he was prescribed antibiotics.

At a May 19, 2015 follow-up visit, Marshall complained of tenderness along his rib. On May 20, 2015, after a cardiothoracic consultation, Gera requested another CT scan and bone scan and recommended that Marshall be evaluated by an infectious disease specialist at a tertiary care facility. On July 6, 2015, a physician's assistant at WVU evaluated Marshall and recommended a CT scan for further assessment of the wound. The CT scan results were negative for wound-related complications but revealed two pulmonary nodules. The physician's assistant prescribed a silver nitrate treatment and recommended a repeat CT scan in six months to reevaluate the nodules. On July 28, 2015, Marshall reported burning and increased drainage that seemed to be exacerbated by the silver nitrate. His wound was cleaned and covered, and he was given ibuprofen for discomfort. On August 4, 2015, Gera requested an urgent consultation with an infectious disease specialist.

On August 17, 2015, Marshall returned to Dr. Khakoo, the WVU infectious disease specialist, who recommended a nuclear study. Accordingly, on August 25, 2015, Gera ordered laboratory tests and an imaging study. The nuclear study, consisting of a white blood cell scan was conducted on November 10, 2015. The results were deemed "unremarkable." Compl. Ex. C at 57, ECF No. 1-4. Nevertheless, Marshall continued to experience wound drainage in November 2015. On November 20, 2015, Gera took a culture, which tested positive for MRSA.

On December 31, 2015, Marshall appeared at Health Services to "review progress of finding a plan for resolution of continued painful chest drainage." *Id.* at 73. That same day, Dr. Moubarek told Dr. Khakoo about the persistent drainage. Dr. Khakoo expressed concern about osteomyelitis and suggested referring Marshall back to his thoracic surgeon for another opinion and offered to repeat some of the studies. Meanwhile, on January 7, 2016, Marshall, frustrated by perceived "lack of diligence demonstrated in my medical care," requested a transfer to a medical facility capable of providing prompt medical care. Compl. Ex. E at 2, ECF No. 1-6. The request was denied by Hamilton-Rumer on the basis that Marshall had "been receiving appropriate care." *Id.*

Upon seeing Marshall on January 12, 2016, Gera submitted an urgent request for a consultation with cardiothoracic surgery for revaluation of the incision site. The thoracic surgeon ordered another CT scan and bone scan on February 1, 2016. On February 16, 2016, Marshall underwent the bone scan, which showed a mild uptake in Marshall's right rib cage in the area of the sixth, seventh, and eighth ribs. "Given the low-level uptake of the radionuclide," however, medical staff concluded that there was a low probability of osteomyelitis. Compl. Ex. D at 22, ECF No. 1-5.

On February 18, 2016, Marshall was sent to a plastic surgeon for a consultation. The plastic surgeon assessed him as having a "possible suture granuloma" and performed a local procedure to

open the area, remove a small suture from the wound, irrigate the area, and allow it to drain. *Id.* at 26-27, 29. After a March 3, 2016 follow-up visit with Marshall, the plastic surgeon noted that there were a few areas of drainage and that a wound infection could not be ruled out. She also noted that he may be having an allergic reaction to the sutures and recommended another excision of the surgical site and a debridement procedure. On April 18, 2016, the plastic surgeon removed an ethibond suture that may have been causing Marshall's condition, and she later performed a debridement on August 8, 2016.

Since then, Marshall's surgical wound has not increased, but it appears to remain unhealed. Marshall last saw the plastic surgeon on September 27, 2016, when she recommended that he be reevaluated by the thoracic surgeon. On November 21, 2016, the thoracic surgeon examined Marshall and recommended that an MRI be performed.

## DISCUSSION

Defendants seek dismissal of the Complaint or summary judgment in their favor on several grounds, including that: (1) Hamilton-Rumer and Gera are entitled to absolute immunity under the Public Health Service Act, 42 U.S.C. § 233 (2012); (2) Warden Stewart and Shook did not personally act or fail to act in deliberate indifference to Marshall's serious medical needs; (3) Dr. Moubarek did not act with deliberate indifference to Marshall's serious medical needs; (4) Marshall's claims against Defendants in their official capacities are barred by sovereign immunity; and (5) Defendants are entitled to qualified immunity.

**I. Legal Standard**

Because Defendants have submitted evidence for the Court's review, and because Marshall has not requested an opportunity for discovery, the Motion is construed as a motion for summary

judgment. *See* Fed. R. Civ. P. 12(d). Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

## II. Public Health Service Immunity

As a threshold matter, Marshall's *Bivens* claims against Hamilton-Rumer and Gera are barred by the absolute immunity entitled to Public Health Service ("PHS") officers and employees under 42 U.S.C. 233(a). Section 233(a) provides that:

> The remedy against the United States provided by sections 1346(b) and 2672 of Title 28 . . . for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions . . . by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or employee (or his estate) whose act or omission gave rise to the claim.

42 U.S.C. 233(a). In *Hui v. Castaneda*, 559 U.S. 799 (2010), the United States Supreme Court held that "[b]ased on the plain language of § 233(a), . . . PHS officers and employees are not personally subject to *Bivens* actions for harms arising out of such conduct." *Id.* at 802. Rather, § 233(a) "grants absolute immunity to PHS officers and employees for actions arising out of the performance of medical or related functions within the scope of their employment." *Id.* at 806.

Here, Hamilton-Rumer and Gera have both attested that they are employed by PHS. Hamilton-Rumer has been a PHS employee since February 1, 2013, and he began working at FCI-Cumberland on September 20, 2015. Gera has been a PHS employee since July 2011 and has been at FCI-Cumberland since February 2009. Marshall does not assert or provide evidence that he had any contact with, or received treatment from, Hamilton-Runner or Gera before the time that they were employed by PHS. Accordingly, the *Bivens* claims against them must be dismissed. *See id.* at 802; *see also Angelina v. Cumberland FCI Health Servs.*, No. GJH-15-2427, 2017 WL 1025720, at *5 (D. Md. Mar. 15, 2017) (dismissing a prisoner's *Bivens* claim against a PHS employee for failing to provide adequate medical care).

### III. Supervisory Liability

Meanwhile, Warden Stewart and Health Services Administrator Shook are entitled to summary judgment in their favor because Marshall has not demonstrated that they had any personal involvement in his medical care or lack thereof. "In a *Bivens* suit, there is no *respondeat superior* liability. Instead, liability is personal, based upon each defendant's own constitutional violations." *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (internal citation omitted). A plaintiff making a supervisory liability claim under *Bivens* must show that the supervisor had "actual or constructive knowledge" that the subordinate "was engaged in conduct that posed a pervasive and unreasonable

9

risk of constitutional injury to citizens like the plaintiff, and that the supervisor's response showed deliberate indifference to or tacit authorization of the alleged offensive practices, and caused the plaintiff's injury." *Baker v. United States*, 645 F. App'x 266, 269 (4th Cir. 2016) (quoting *Wilkins v. Montgomery*, 751 F.3d 214, 226-27 (4th Cir. 2014)).

Marshall has not sufficiently alleged or established that Warden Stewart and Shook were personally responsible for his medical screening, diagnosis, or treatment or that they had actual or constructive knowledge that he was receiving inadequate medical treatment. Although Marshall cites Warden Stewart's May 16, 2013 dismissal of his April 26, 2013 ARP complaining of a failure to provide adequate medical care, the Warden's response reflected his understanding that "it has been determined [that Marshall has] received appropriate, progressive care related to the abnormality of [his] lung." Compl. Ex. G at 3-4, ECF No. 1-8. Similarly, Warden Stewart's receipt of Marshall's July 13, 2016 transfer request does not establish that the Warden had knowledge of inadequate medical care where the medical records show a long history of efforts to treat his condition. Significantly, as a non-medical correctional supervisor, Warden Stewart was entitled to rely on the medical opinions and expertise of the professionals working in FCI-Cumberland Health Services regarding the treatment of Marshall's condition. *See Miltier v. Beorn*, 896 F.2d 848, 854-55 (4th Cir. 1990) (stating, in finding that wardens had no supervisory liability under § 1983 for alleged inadequate medical care, that "it would be an unprecedented extension of the theory of supervisory liability to charge these wardens, not only with ensuring that [the prisoner] received prompt and unfettered medical care, but also with ensuring that their subordinates employed proper medical procedures—procedures learned during several years of medical school, internships, and residencies"), *overruled on other grounds by Farmer v. Brennan*, 511 U.S. 825 (1994). *See*

*generally Hartman v. Moore*, 547 U.S. 250, 254 n.2 (2006) (describing a *Bivens* action as the federal analog to a § 1983 actions); *Dachman v. Shalala*, 950 F. Supp. 708, 710 (D. Md. 1997) ("[C]ourts generally apply § 1983 law to *Bivens* cases.").

As for Shook, Marshall argues that he has alleged that Shook, along with Dr. Moubarek, Hamilton-Rumer, and Gera, were active members of the Utilization Review Committee and "consulted and colluded" with each other to "systematically delay my medical treatment." Pl.'s Opp'n Mot. Dismiss 3, ECF No. 16. The record, however, lacks evidence to support his claim or to refute Shook's declaration that he "did not examine, diagnose, or treat inmates' medical conditions"; that he "did not provide treatment or interact with" Marshall; and that "[a]t no point did I participate in, or become aware of, a scheme to delay Plaintiff's medical treatment." Shook Decl. ¶¶ 2, 3, Mot. Dismiss Ex. 3, ECF No. 14-4. Accordingly, the Court will grant Defendants' Motion as to Warden Stewart and Shook.

## IV. Eighth Amendment

The only remaining Defendant is Dr. Moubarek, Marshall's treating physician. The record, however, lacks sufficient evidence to create a genuine issue of material fact whether Dr. Moubarek, or any of the other Defendants, acted with deliberate indifference toward Marshall's condition in violation of the Eighth Amendment.

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII. An inmate's Eighth Amendment rights are violated when there is "deliberate indifference" to "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). A deliberate indifference claim has both an objective component—that there objectively exists a serious medical condition and an excessive risk to the inmate's health and

safety—and a subjective component—that the official subjectively knew of the condition and risk. *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1978) (holding that an official must have "knowledge" of a risk of harm, which must be an "objectively, sufficiently serious").

To be objectively "serious," the condition must be "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jackson*, 775 F.3d at 178 (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)). However, deliberate indifference "does not require proof that the plaintiff suffered an actual injury." *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 210 (4th Cir. 2017). Instead, it is enough that the defendant's actions exposed the plaintiff to a 'substantial *risk* of serious harm.'" *Id.* (quoting *Farmer*, 511 U.S. at 837).

As for the subjective component, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson*, 775 F.3d at 178 (quoting *Farmer*, 511 U.S. at 837). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* (citations omitted). "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* Thus, "[d]eliberate indifference is "more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (internal alterations omitted). Under this standard, a mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Id.*

Here, the record establishes that there has been no attempt by Dr. Moubarek or other members of the prison medical staff to ignore or recklessly disregard a serious medical condition suffered by Marshall. To the contrary, the record demonstrates that Dr. Moubarek and his medical staff consistently responded to Marshall's medical complaints relating to the mass on his right lung and the unhealed wound that resulted from the surgical procedures employed to address the mass.

As for the mass on Marshall's lung, FCI-Cumberland medical staff noticed it on January 9, 2013, two days after he arrived at the institution. They subsequently sent Marshall to multiple specialists, including a cardiothoracic surgeon and an infectious disease specialist at WVU, in order to obtain a diagnosis and treatment of the mass. Medical staff also conducted or facilitated the performance of repeated CT, PET, bone, and other scans as deemed necessary, as well as procedures including a bronchoscopy, thoracoscopy, and a thoracotomy with a wedge biopsy. Based on the input of the various specialists, Marshall's physicians ultimately concluded that the mass on Marshall's lung was a fungal colonization, not cancer, and concluded that, because such colonizations do not require immediate treatment absent extenuating medical conditions, continued observation was the appropriate treatment plan. When he later complained again of pain in his chest, medical staff ordered additional tests and scans, including an MRI, in order to determine whether there was any remaining health risk.

Marshall's second condition, an unhealed surgical incision deriving from June 2013 procedures to address the lung mass, was also consistently treated by either FCI-Cumberland medical staff or outside specialists, including cardiothoracic and plastic surgeons, employing various tests, scans, and procedures. After drainage initially appeared in August 2013, an x-ray was taken, antibiotics were administered, and a stitch was removed from the site, after which the drainage

stopped. Compl. Ex. A at 44. When the drainage reappeared in 2015, FCI-Cumberland medical staff consistently evaluated the complaint before determining whether follow-up consultations or procedures were necessary. Finally, when they enlisted a plastic surgeon who removed another suture, the drainage stopped again.

The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely desirable." *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977). Here, the record of consistent medical attention to address Marshall's conditions establishes that prison medical staff did not deliberately fail to provide treatment. The treatment included consultations, in some cases on multiple occasions, with a pulmonologist, an infectious diseases specialist from WVU, a thoracic surgeon, and a plastic surgeon. It included numerous tests and procedures, including x-rays, CT scans, PET scans, bone scans, cultures, and white blood cell surveys, some conducted on multiple occasions. Even though it took these multiple tests, consultations, and procedures to finally diagnose the lung mass and to address the discharge from Marshall's wound, and some transfer of information, scans, or procedures were delayed, an "inadvertent failure to provide adequate medical care" does not amount to deliberate indifference. *Estelle,* 429 U.S. at 105-06 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."). To the extent that Marshall disagrees with the course of care provided to him, such a disagreement does not establish an Eighth Amendment violation absent exceptional circumstances. *Scinto,* 841 F.3d at 225. Marshall has not identified, let alone provided evidence of, any exceptional circumstances such that his disagreement over the appropriate level of care rises to an Eighth Amendment violation.

Accordingly, Defendants are entitled to summary judgment on all claims. The Court therefore need not, and does not, address Defendants' remaining arguments.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment, construed as a motion for summary judgment, will be granted. A separate Order shall issue.

Date: August 23, 2017

THEODORE D. CHUANG
United States District Judge